**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | | |
|---|---|---|
| PERSONALIZED MEDIA COMMUNICATIONS, LLC, | § § § | Civil Action No. |
| Plaintiff, | § § | 2:12-cv-68-JRG |
| v. | § § | **JURY TRIAL DEMANDED** |
| ZYNGA INC., | § § | |
| Defendant. | § § | |

## DEFENDANT ZYNGA INC.'S ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS TO COMPLAINT FOR PATENT INFRINGEMENT

Defendant Zynga Inc. ("Zynga") hereby submits its Answer, Affirmative Defenses, and Counterclaims to the Complaint for Patent Infringement filed by Plaintiff Personalized Media Communications, LLC ("PMC"). Zynga firmly denies that it infringes any valid claim of PMC's asserted patents. Through its Complaint, PMC accuses technology that falls clearly outside of the intended scope of the asserted patents, which were procured only as a result of severe and intentional prosecutorial misconduct spanning decades. This lawsuit represents the latest in a series of anticompetitive efforts by PMC to unlawfully extend the term and scope of its improperly-obtained patent monopoly. PMC's claims lack merit, Zynga has requested that the Court deem this case exceptional, and it intends to recover its costs, expenses, and attorneys' fees for defending itself against PMC's meritless claims.

To the extent any allegation contained in the Complaint is not specifically admitted in this Answer, it is hereby denied. Zynga further denies any allegation that may be implied by or inferred from the headings of the Complaint.

## THE PARTIES

1.      Zynga is without sufficient knowledge to either admit or deny the allegations of paragraph 1, and therefore denies them.

2.      Zynga admits the allegations of paragraph 2.

3.      Zynga admits the allegations of paragraph 3.

## JURISDICTION AND VENUE

4.      Zynga admits that PMC's Complaint purports to be an action for patent infringement arising under the patent laws of the United States, including 35 U.S.C. §§ 271, *et seq.*  Zynga also admits that this Court has jurisdiction over actions for patent infringement generally under 28 U.S.C. §§ 1331 and 1338(a).  Zynga denies, however, that PMC's Complaint sets forth a valid or meritorious claim and denies the remaining allegations of paragraph 4.

5.      Zynga admits that it transacts business within the State of Texas and this judicial district, but denies that it has committed acts of patent infringement within the State of Texas and/or in this judicial district.  Zynga also admits that, for purposes of this action, this Court has personal jurisdiction over Zynga.  Zynga denies, however, that this judicial district is convenient for adjudication of the claims alleged in this action.  Zynga denies the remaining allegations of paragraph 5.

6.      Zynga admits that it transacts business within this judicial district and that its games and services are available to residents of this judicial district, but denies that it has committed and/or induced acts of patent infringement in this district.  Zynga also admits that, for purposes of this action, venue is proper in this district, but reserves its rights to move the Court to transfer this action to another, more convenient venue pursuant to 28 U.S.C. § 1404.  Zynga denies the remaining allegations of paragraph 6.

7.    Zynga admits that it is the world's leading social game developer.  Zynga further admits that its games and services are available to residents of the State of Texas and this judicial district.  Zynga admits that it regularly, directly or through its intermediaries, deploys, distributes, advertises, and offers social games across the nation and worldwide.  Zynga also admits that it maintains an office in Dallas, Texas.  Zynga admits that it has millions of monthly active users, across the nation and worldwide, of social games such as CityVille and FarmVille.  Zynga denies the remaining allegations of paragraph 7.

8.    Zynga admits that it maintains a facility in McKinney, Texas and that said facility is or has been involved with the development and deployment of certain of Zynga's social games, such as Words With Friends and Hanging With Friends.  Zynga denies the remaining allegations of paragraph 8.

9.    Zynga admits that it transacts business within the State of Texas and this judicial district and that its games and services are available to residents of the State of Texas and this judicial district.  Zynga denies the remaining allegations of paragraph 9.

## FACTUAL BACKGROUND

10.    Zynga is without sufficient knowledge to either admit or deny the allegations of paragraph 10, and therefore denies them.

11.    Zynga admits that it makes and/or offers social games including Treasure Isle, CastleVille, Pioneer Trail (FrontierVille), Adventure World, CityVille, Empires & Allies, FarmVille, Zynga Poker, Café World, FishVille, PetVille, Vampire Wars, YoVille, Hanging With Friends, Words With Friends, DreamZoo, CityVille, Chess With Friends, Scramble Challenge Edition, and Drop 7.  Zynga denies the remaining allegations of paragraph 11.

12.    Paragraph 12 does not include an allegation that requires a response from Zynga.

## COUNT I

13.     Zynga refers to and incorporates by reference its answers to paragraphs 1 through 12 as its answer to paragraph 13.

14.     Zynga admits that United States Patent No. 7,797,717 ("the '717 Patent") purports, on its face, to have issued on September 14, 2010, to bear the title "Signal Processing Apparatus and Methods," and to have been assigned to PMC.  Zynga denies that the '717 Patent was duly and/or legally issued.  Zynga admits that Exhibit 1 purports, on its face, to be a copy of the '717 Patent.  Zynga is without sufficient knowledge to either admit or deny the remaining allegations of paragraph 14, and therefore denies them.

15.     Zynga denies the allegations of paragraph 15.

16.     Zynga denies the allegations of paragraph 16.

17.     Zynga denies the allegations of paragraph 17.

18.     Zynga denies the allegations of paragraph 18.

19.     Zynga denies the allegations of paragraph 19.

20.     Zynga denies the allegations of paragraph 20.

## COUNT II

21.     Zynga refers to and incorporates by reference its answers to paragraphs 1 through 20 as its answer to paragraph 21.

22.     Zynga admits that United States Patent No. 7,908,638 ("the '638 Patent") purports, on its face, to have issued on March 15, 2011, to bear the title "Signal Processing Apparatus and Methods," and to have been assigned to PMC.  Zynga denies that the '638 Patent was duly and/or legally issued.  Zynga admits that Exhibit 2 purports, on its face, to be a copy of the '638 Patent.  Zynga is without sufficient knowledge to either admit or deny the remaining allegations

of paragraph 22, and therefore denies them.

23.     Zynga denies the allegations of paragraph 23.

24.     Zynga denies the allegations of paragraph 24.

25.     Zynga denies the allegations of paragraph 25.

26.     Zynga denies the allegations of paragraph 26.

27.     Zynga denies the allegations of paragraph 27.

28.     Zynga denies the allegations of paragraph 28.

## COUNT III

29.     Zynga refers to and incorporates by reference its answers to paragraphs 1 through 28 as its answer to paragraph 29.

30.     Zynga admits that United States Patent No. 7,734,251 ("the '251 Patent") purports, on its face, to have issued on June 8, 2010, to bear the title "Signal Processing Apparatus and Methods," and to have been assigned to PMC.  Zynga denies that the '251 Patent was duly and/or legally issued.  Zynga admits that Exhibit 3 purports, on its face, to be a copy of the '251 Patent.  Zynga is without sufficient knowledge to either admit or deny the remaining allegations of paragraph 30, and therefore denies them.

31.     Zynga denies the allegations of paragraph 31.

32.     Zynga denies the allegations of paragraph 32.

33.     Zynga denies the allegations of paragraph 33.

34.     Zynga denies the allegations of paragraph 34.

35.     Zynga denies the allegations of paragraph 35.

36.     Zynga denies the allegations of paragraph 36.

## COUNT IV

37.     Zynga refers to and incorporates by reference its answers to paragraphs 1 through 36 as its answer to paragraph 37.

38.     Zynga admits that United States Patent No. 7,860,131 ("the '131 Patent") purports, on its face, to have issued on December 28, 2010, to bear the title "Signal Processing Apparatus and Methods," and to have been assigned to PMC.  Zynga denies that the '131 Patent was duly and/or legally issued.  Zynga admits that Exhibit 4 purports, on its face, to be a copy of the '131 Patent.  Zynga is without sufficient knowledge to either admit or deny the remaining allegations of paragraph 38, and therefore denies them.

39.     Zynga denies the allegations of paragraph 39.

40.     Zynga denies the allegations of paragraph 40.

41.     Zynga denies the allegations of paragraph 41.

42.     Zynga denies the allegations of paragraph 42.

43.     Zynga denies the allegations of paragraph 43.

44.     Zynga denies the allegations of paragraph 44.

## PMC'S PRAYER FOR RELIEF

WHEREFORE, Zynga denies that PMC is entitled to any of the relief it seeks.

## ZYNGA'S AFFIRMATIVE DEFENSES

Without admitting or acknowledging that it bears the burden of proof as to any of the following affirmative defenses and based upon information and belief to date, Zynga asserts the following defenses:

## FIRST AFFIRMATIVE DEFENSE

### (Failure to State a Claim)

1.     The Complaint fails to state a claim upon which relief can be granted.

## SECOND AFFIRMATIVE DEFENSE

### (Invalidity and Unenforceability)

2.     The '717 Patent, the '638 Patent, the '251 Patent, and the '131 Patent (collectively, the "Patents in Suit"), and all of their claims, are invalid and/or unenforceable due to double patenting (including of the obviousness type and of the type condemned by *In re Schneller*, 397 F.2d 350 (CCPA 1968) and its progeny) and/or for failure to comply with one or more of the requirements of the patent laws of the United States as set forth in Title 35 of the United States Code, including but not limited to §§ 101, 102, 103, and/or 112.

## THIRD AFFIRMATIVE DEFENSE

### (Non-Infringement)

3.     Zynga is not infringing and has not infringed, induced infringement, and/or contributed to the infringement of, either literally or under the doctrine of equivalents, any valid claim of the Patents in Suit.  If the claims at issue are interpreted so broadly as to read on any of Zynga's products or services, Zynga does not and has not infringed, induced infringement of, and/or contributed to the infringement of, any valid claim of the Patents in Suit under the Reverse Doctrine of Equivalents.

## FOURTH AFFIRMATIVE DEFENSE

### (Scope of the Prior Art)

4.     The prior art known before the alleged invention(s) covered by the Patents in Suit limits and restricts the scope of the Patents in Suit such that Zynga does not infringe any valid,

enforceable claims of the Patents in Suit.

### FIFTH AFFIRMATIVE DEFENSE

### (Prosecution History Estoppel)

5.      On the basis of proceedings before the United States Patent and Trademark Office ("PTO") during prosecution of the applications that matured into the Patents in Suit and during prosecution and reexamination of related patents, and of statements made by or on behalf of the applicants in such proceedings, PMC is estopped from construing the Patents in Suit to cover the accused products and/or services.

### SIXTH AFFIRMATIVE DEFENSE

### (Estoppel)

6.      Each of PMC's purported claims against Zynga is barred, in whole or in part, by the doctrine of equitable estoppel.

### SEVENTH AFFIRMATIVE DEFENSE

### (No Entitlement to Injunctive Relief)

7.      To the extent that the Complaint can be read to request injunctive relief, the relief PMC seeks is barred because, were PMC entitled to any relief, PMC has an adequate remedy at law.

### EIGHTH AFFIRMATIVE DEFENSE

### (Inequitable Conduct)

8.      The Patents in Suit are unenforceable due to inequitable conduct before the PTO in connection with the prosecution of the applications leading to issuance of the Patents in Suit and related patents belonging to the same patent family (collectively, the "Harvey Patents").  As with any applicant before the PTO, PMC, its predecessors-in-interest, its agents, and the

inventors owed the PTO a duty of candor and good faith, including a duty of disclosure.  As described herein, one or more of these agents violated their duties by misrepresenting material information to and withholding material information from the PTO.  The actions of the applicants were sufficiently egregious to cause the examiner to issue a communication that specifically stated his belief that the actions of the applicants were intended to deceive the PTO and that those actions harmed the public interest.  Upon information and belief, PMC's misrepresentations and failure of disclosure were done with intent to deceive and/or mislead the PTO.  In the absence of such failure, the Harvey Patents would not have issued with their claims in the form they were issued, would have been cancelled or confirmed only with amendments in reexamination, or would have been issued only with terminal disclaimers.  PMC's misrepresentations and failure of disclosure with respect to the prosecution of any of the Harvey Patents and related applications render the Patents in Suit unenforceable due to inequitable conduct and infectious unenforceability.

9.     The Patents in Suit share a common ancestry with each other and with dozens of other applications in the portfolio of alleged inventor John Christopher Harvey ("Harvey Portfolio").  The earliest parent application, Serial No. 06/317,510, was filed on November 3, 1981 ("the 1981 application") and was ultimately issued on September 15, 1987.  The 1981 application contained 44 pages of text.

10.    On February 14, 1986, a continuation application (Serial No. 06/829,531) was filed from the 1981 application.  From that continuation application, a continuation-in-part application (Serial No. 07/096,096) was filed on September 11, 1987 ("the 1987 application").  The 1987 application contained 557 pages of text.  Between March 2, 1995 and June 7, 1995, in an apparent effort to beat the GATT amendments in 1995 that were set to change the patent term

from 17 years from patent issuance to 20 years from the filing of the first application, PMC filed

approximately 300 applications based on the 1987 application, four of which resulted in the

Patents in Suit.

11.     While the 1987 application claimed priority back to the 1981 application, the

1987 application did *not* incorporate by reference any part of the 1981 application and the 1987

and 1981 applications described significantly different subject matter.  On information and belief,

PMC failed to disclose and misrepresented the dissimilarities between the 1981 and 1987

applications during prosecution of the Patents in Suit and related patents so as to induce the PTO

into treating claims based upon the disclosures of the 1987 application as supported by the

disclosures of the 1981 application, thereby obtaining issuance of claims that were not novel at

the time of the 1987 application.  As will be referenced in more detail below, the primary

examiner of the Harvey Portfolio stated that a pattern of intentional misrepresentations of the

legal application of 35 U.S.C. §§ 120 and 112 permeated the Harvey Portfolio.

12.     On information and belief, PMC withheld relevant and material information from

the PTO despite PMC's duty to disclose.  One such instance was with respect to five oppositions

that were filed in late 1997 to early 1998 against PMC's European application (App. No.

88908836.5) in the European Patent Office.  The oppositions included prior art and arguments

relevant and material to PMC's U.S. applications.  On January 8, 1999, PMC filed a response to

these oppositions.  On the issue of priority, which was an issue relevant and material to many of

PMC's U.S. applications, PMC argued that "every single claim of the opposed patent includes at

least one essential element of the additional subject matter" found in the 1987 application but *not*

the 1981 application.  Even though the claims of PMC's European application may not be

identical to the claims of PMC's U.S. applications, PMC's admission regarding the European

claims would be highly relevant in determining the difference in scope between the 1981 and the 1987 applications.  However, despite the high relevancy and materiality of the oppositions and response, PMC merely provided the USPTO with the application number of the European application without identifying the oppositions and response.  On information and belief, these omissions were made with intent to conceal the oppositions and response in order to deceive the PTO as to the patentability and priority of the claims that issued in the Patents in Suit and in related patents.

13.     Another tactic PMC used to conceal relevant and material information was to overwhelm the PTO with information.  PMC submitted to the PTO huge sets of references, most of which were of no or limited pertinence to the claims being examined or reexamined, within which highly relevant references were buried, rendering "disclosure" of those highly relevant references purposely ineffective.  For example, during prosecution of the '717 Patent, over 2700 references were submitted to the examiner.  Some of these references were unquestionably irrelevant.  For example, the faces of the Patents in Suit cite U.S. Patent No. 33,189 (Dougal), a 1861 patent that is titled "Improvement in Bee-Hives"; U.S. Patent No. 2,731,197 (Parker *et al*.), a 1956 patent that is directed to an improved "stop pin box" used to control "calculator actuators" in accounting machines; and U.S. Patent No. 4,473,068 (Oh), a 1982 patent that is directed to an improved implant "for use in retention of the greater trochanter" in hip replacements.  Within this massive disclosure were several key references, including: U.S. Patent Nos. 3,886,302 (Kosco); 4115,662 (Gulnet *et al*.); 4,186,413 (Mortimer); 4,295,223 (Shutterly); 4,305,101 (Yarbrough *et al*.); 4,323,922 (den Toonder *et al*.); 4,390,901 (Keiser); and 4,488,179 (Kruger *et al*.).  On information and belief, PMC deliberately buried highly relevant references in an effort to thwart proper examination of the claims and did so intending to deceive the PTO.

14.     The amount of information disclosure presented to the examiner was exacerbated by the fact that the 1987 application, which gave rise to the Patents in Suit, was 557 pages.  On information and belief, this massive specification was submitted to overwhelm the examiner and preclude effective review of the application by the PTO.  As an example, due to the unnecessary length of the 1987 application, it is exceedingly difficult to accurately assess issues such as written description and enablement.  Additionally, the length of the specification makes it very difficult to determine what subject matter is common to the 1981 and 1987 applications.

15.     Moreover, the applicants submitted unnecessarily numerous claims during prosecution of the Harvey applications.  For example, during prosecution of the claims that ultimately issued as the '251 Patent, PMC presented the PTO with 197 claims.  On information and belief, the numerous claims were submitted to overwhelm the examiner and to preclude effective review of the applications by the PTO.  In addition, in all of the Harvey applications, PMC sought thousands of patent claims, making it impractical for the PTO to assess whether any claims in different patents were directed to the same patentable invention.  On information and belief, these actions were undertaken with intent to deceive the PTO into allowing or confirming claims that were not actually patentable.

16.     PMC's pattern of dishonesty also was evident in its claim of small entity status in violation of the relevant rules and regulations regarding payment of fees as a small or large entity.  Such misrepresentation constituted fraud on the PTO.  The Manual of Patent Examining Procedure states that "small entity status must not be established unless the person or persons signing the verified statement can unequivocally make the required self-certification."  M.P.E.P. § 509.03 (6th ed., Jan. 1995).  "[A]ny attempt to improperly establish status as a small entity will be viewed as a serious matter by the [PTO]."  *Id.*  The PTO does not normally question claims to

entitlement to small entity status, but improper claiming of such status may be considered fraud

on the PTO. *See* 37 C.F.R. §1.28(d)(2) (1995) ("Improperly and with intent to deceive (i)

Establishing status as a small entity, or (ii) Paying fees as a small entity shall be considered as a

fraud practiced or attempted on the Office.").

   17.  It is clear that the applicants had actual knowledge that claiming small entity

status for the Harvey patent applications was inappropriate by December 1994, at the latest.  In

January 1995, after allowance of one of the parents of the Patents in Suit (U.S. Patent No.

5,335,277), a document titled "Notification of Change in Status Under 27 C.F.R. § 1.28(b) and

Payment of Issue Fee Deficiency Under 37 C.F.R. § 1.28(c)" was submitted by PMC's

predecessor-in-interest, Personalized Mass Media Corporation ("PMMC").  That submission

stated (emphasis added):

> Pursuant to 37 C.F.R. § 1.28(c), Attorneys for Applicants hereby
>
> provide notification that Personalized Mass Media Corporation
>
> ("PMMC"), the assignee of U.S. Patent No. 5,335,277, no longer
>
> qualifies for small entity status under M.P.E.P. § 509.02 and 37
>
> C.F.R. § 1.9 for paying reduced patent fees for U.S. Patent No.
>
> 5,335,277.  *PMMC lost its entitlement to small entity status for U.S.*
>
> *Patent No. 5,335,277 in March, 1994 as a result of a license*
>
> *agreement with a large entity*.  Applicants and Attorneys for
>
> Applicants were unaware that PMMC lost its entitlement to small
>
> entity status in March, 1994 and inadvertently paid the reduced
>
> issue fee for U.S. Patent No. 5,355,277 on May 12, 1994 claiming
>
> small entity status.

A verified statement from the applicants' counsel, Thomas Scott, Jr., was submitted in support of this document.  It purported to explain "how the error in good faith occurred."  In the verified statement, Mr. Scott stated that PMMC was *not* actually entitled to small entity status as of March 1994 and that he did not realize that fact until December 1994.

18.     On information and belief, PMC also had licenses with other large entities by January 1996.  Any such agreements would have been relevant to the claiming of small entity status for the Harvey Patents and patent applications as of the dates of the agreements.  On information and belief, PMMC and Sony entered into a license agreement on October 31, 1995, and PMMC and The Weather Channel entered into a license agreement on January 31, 1996.

19.     Despite having actual knowledge that it was not entitled to claim small entity status, over a period of several years PMC continued to make such claims during prosecution of the Patents in Suit.  It was not until 2000 that PMC belatedly admitted that its status as a small entity "has been changed" and that small entity fees were inappropriate.  PMC filed a "Notification of Change of Status Under 37 C.F.R. § 1.28(B) and Payment of Fee Deficiencies Under 37 C.F.R. § 1.28(C)," which was accepted by the PTO.  However, in these submissions, PMC did *not* indicate to the PTO that the supposed error had been discovered approximately six years earlier, in late 1994, or that it had previously filed a verified statement regarding the supposed errors.  PMC also did not provide an explanation for the repeated small entity status errors or explain why it did not correct the errors years earlier.

20.     On information and belief, PMC concealed the truth regarding the improper claims to small entity status to mislead the PTO into concluding that the errors were made in good faith and therefore could be excused under 37 C.F.R. § 1.28(c) (1995).  On information and belief, PMC's claims of small entity status from 1994 to 2000 were not made with the belief they

were justified, nor were the small entity fees paid in that period paid in good faith.  This pattern of improperly claiming small entity status constituted fraud on the PTO.

21.     PMC's pattern of improper actions during prosecution of these applications caused the examiner to issue a remarkable communication.  In the 38-page document, the examiner stated that the applicants had engaged in a systematic strategy to mislead and overwhelm the PTO and did so intending to deceive the PTO.  The communication was filed in several Harvey applications, including Serial No. 08/113,329 on January 26, 2001.  A copy of the document is attached as Exhibit A.

22.     In the communication, the examiner stated:  "Applicants and their counsel (Thomas Scott, Jr.) have been attempting to secure patents by pursuing their unique, but improper, prosecution strategy for many years . . . . Applicants' prosecution 'strategy' has involved the submission of tens of thousands of claims, as well as thousands [of] prior art references, a substantial number of which are irrelevant."  Exhibit A at 3 (internal quotation omitted).  The Examiner stated that the files of the various Harvey Patents "are replete with a pattern of material misrepresentations of law and related factual omission.  As a consequence, the portfolio prosecution record adds up to a virtually meaningless record as to the merits and thus, among other things, has caused unjustifiable and prejudicial delay."  *Id.* at 7.  The examiner stated his belief that these actions were not unintentional:  "For the purpose of protecting the public interest, the primary examiner states for the record that he firmly believes it was the principal counsel's intent to mislead the U.S.P.T.O."  *Id.* at 15.

23.     As to the priority issue, the examiner stated that applicants knew or should have known that "continuity of disclosure" was required for a claim to be entitled to the filing date of an earlier application.  *Id.* at 11.  The examiner noted that the Administrative Law Judge in an

ITC investigation involving some of the earlier Harvey Patents "reproached applicants for improperly identifying written description from the 1981 44-page parent specification" and that they received judicial notice that "the written description for applicants' claims is necessarily found in the 1987 557-page specification and not the 1981 44-page specification." *Id.* at 12.  The examiner stated that the applicants' arguments regarding priority "do not appear to be *bona-fide*" and that the applicants' submissions "misstate the legal test" for priority.  *Id.* at 13.  Moreover, "the primary examiner and other U.S.P.T.O. examiners have relied in good faith" on applicants' misstatements and omissions.  *Id.* at 14.  The examiner stated that applicants engaged in "a blatant attempt to obtain literal patent coverage claiming priority to 1981 for something that they did not have in their possession as of the 1981 filing date."  *Id.* at 30.  These acts, and others, "caused unjustifiable and prejudicial delay" and are "grounds for rejections of the claim on the basis of laches."  *Id.* at 14.

24.     As to the extraordinary number of claims presented during prosecution, the examiner noted that a "conservative" estimate is that the applicants presented "between 18 and 36 claims per page of the 1987 description; i.e., about one claim for every 8.5 to 17.7 words."  *Id.* at 19.  The examiner concluded:  "The number of claims filed by applicants has caused unjustifiable and prejudicial delay."  *Id.*

25.     As to the extraordinary number of references cited by applicants during prosecution, the examiner noted that during prosecution of the application then under consideration, "applicants have filed approximately 2,200 references, many of which are irrelevant."  *Id.* at 20.  The examiner stated that some foreign references were not accompanied by statements of relevance or translations and were therefore in violation of PTO rules.  Among the irrelevant references were patents to a beehive and business cards.  *See id.*  The examiner

concluded:  "These, among other references, create an onerous burden on the U.S.P.T.O. and have caused unjustifiable and prejudicial delay."  *Id.*

26.     As to the small entity issue, the examiner noted that the applicants simultaneously had claimed small and large entity status for similar subject matter.  *Id.* at 31-36.  The examiner noted that the PTO had requested an explanation for the varying payments, but had not received one.  *Id.* at 31.  The examiner stated that there did not appear to be a difference in the subject matter of the varying claims to small or large entity status and that entity status was inconsistently claimed even within the applicants' subject matter groupings.  The examiner noted that the applicants' counsel had discussed the small/large entity issue with the PTO "at least as early as August 13, 1995."  *Id.* at 34.  The examiner observed that applicants changed the claimed entity status even within the same application.  *See id.*

27.     The examiner noted that the applicants seemed to have tried to justify the inconsistent claims of small and large entity status on a "field of use" clause in a license agreement.  The examiner stated:

> However, over the duration of many months, applicants' "strategy" has included a pattern of changing one or another of the portfolio's 329 applications to and from small and large entity.  Further, the portfolio fee payment record reflects applicants' counsels signing both small and large fee transmittal letters for the portfolio, on the same day.  The fact that the same counsel would sign apparently contradictory fee transmittal letters for both of applicants' portfolios' large and small inventions, claiming the same subject matter, does not appear to be inadvertent.

*Id.* at 35.  The examiner also noted that applicants paid a number of deficient fees only in 2000,

despite the fact that the applicants' counsel was made aware of the issue in a personal interview with a PTO examiner years earlier.  *Id.* at 36.

28.     The examiner also noted other issues, including the applicants' untimely preliminary submissions (*id.* at 20), the applicants' filing of substantially duplicate claims in different applications (*id.* at 20-21), failure to alert examiners handling different Harvey applications of prior art rejections of the same or similar claims in other applications (*id.* at 21), attempting to obtain different interpretations of prior art references from different examiners (*id.* at 24), failing to alert examiners of conflicts between applications directed to the same subject matter but assigned to different examiners (*id.* at 24-25), and the applicants' failure to comply with an agreement with the PTO to consolidate the many Harvey applications into fewer applications (*id.* at 31).

29.     PMC filed a response to the communication.  The PTO later determined that the statements in the communication were not related to patentability of the subject matter claimed in the then-pending applications and, therefore, the communication was withdrawn in some or all of the then-pending Harvey cases on procedural grounds.  In withdrawing the communication, however, the PTO did not do so on the basis that any of the facts contained in the communication were inaccurate.

30.     As a result of the 557-page 1987 application, thousands of cited references, thousands of claims, and hundreds of applications, the examiners likely were forced to rely to a greater extent than usual on the disclosures and representations of PMC.  And, as described above, those disclosures and representations were incomplete and misleading.

31.     These actions relating to the Harvey Patents and patent applications have occurred over a period of many years and evidence a systematic and improper strategy of prosecution.  On

information and belief, these actions were part of a deliberate plan designed to overwhelm and

mislead the PTO.  These actions caused the PTO to issue claims in the Patents in Suit and related

patents, and to confirm the claims of related patents under reexamination that the PTO would not

have issued or been confirmed absent these misrepresentations, failures to disclose, and other

improper prosecution tactics.   The actions with regard to the applications in the Harvey Portfolio

render all of the patents in the portfolio unenforceable due to inequitable conduct.

### NINTH AFFIRMATIVE DEFENSE

### (Prosecution Laches)

32.     Zynga refers to and incorporates by reference the allegations of paragraphs 8

through 31 of its Affirmative Defenses, above.

33.     Each of PMC's purported claims for relief is barred, in whole or in part, by the

doctrine of prosecution laches by reason of PMC's unreasonable, inexcusable, and unexplained

delay in the prosecution of the applications leading to issuance of the Patents in Suit.

34.     PMC could have filed the applications that resulted in the Patents in Suit eight to

fourteen years earlier than their actual filing dates.  Instead, PMC chose to wait nearly fourteen

years—until 1995—to file the applications that resulted in the Patents in Suit and even waited

years after that—as late as 2003 in some cases—before presenting for the PTO's examination the

claims that ultimately issued.  The claims in the Patents in Suit purportedly are based on the

disclosure common to both the 1981 and 1987 applications or the disclosure unique to the 1987

application.  As a result, PMC had possession of all the disclosed concepts in either 1981 or 1987

and could have presented its patent claims for the PTO's examination at that time.  PMC delayed

that presentation for well over a decade, biding its time while others invested in, developed, and

introduced new products and services.  After allowing others to expend their innovative energies,

PMC presented new claims that were ostensibly supported by the 1981 or 1987 applications but actually were carefully crafted with vague wording to target the others' innovations.

35.     It was not until the eve of the effective date of the patent-law amendments implementing the GATT TRIPS agreement (June 8, 1995), after which the term of any resulting patent in the Harvey Portfolio would have been anchored to PMC's claimed priority dates, that PMC finally filed its more than 300 applications, containing hundreds of new patent claims calculated to read on the then-latest technology.  Even then, PMC's continual revision of the claims it presented for the PTO's examination was not concluded; PMC first presented many of the claims in the Patents in Suit for the PTO's examination by amendments years after that.

36.     PMC's efforts in extending its monopoly over the subject matter in its 1981 and 1987 disclosures went well beyond merely delaying the filing of new applications and presentation of new claims.  As indicated previously, PMC had grossly misused the patent process to stall prosecution to obtain later issuance dates.  For example, PMC had misrepresented the law and prior art to the PTO, swamped the examiners with more than 2700 references (including many that were clearly irrelevant), and overwhelmed the PTO with more than 300 applications, thousands of claims, and a 557-page specification.  Consequently, it became a daunting task for the PTO to even find written description support for the claims and identify double patenting issues, let alone examine the novelty of the claims.  It was not until 2010 and 2011—more than fifteen years since the 1995 filing dates—that the Patents in Suit were issued.

37.     By virtue of the calculated delays caused by PMC, PMC postponed examination of these patent claims for decades.  As a result, due to the passage of time and retirement of examiners familiar with what was already known before PMC's alleged 1981 and 1987 priority dates, the PTO's efforts to properly examine whether PMC's claims reflected new inventions

were frustrated.  In addition, PMC's delay tactics have extended the limited 17-year monopoly afforded to what it ostensibly disclosed in 1981 and/or 1987 to 2027 and beyond.  While all of the Harvey Patents that were filed before 1995 have long since expired, the patent term has just begun for the four Patents in Suit and at least 52 other Harvey Patents.  By so manipulating the patent system, PMC has effectively obtained a monopoly of at least 42 years over claims based on its 1981 application (first patent issued in 1987) and at least 39 years over claims based on its 1987 application (first patent issued in 1990).  Over the course of its monopoly, PMC has subjected numerous industry-leading innovators to significant and unjustified harms.

38.     PMC unreasonably and inexcusably delayed seeking and obtaining the claims of the Patents in Suit, as well as related patents issued to it in 2010 to date, with consequent harm to Zynga and other members of the public.  Its unreasonable and inexcusable delays constitute laches and render the Patents in Suit and the related patents unenforceable.

## TENTH AFFIRMATIVE DEFENSE

### (Unclean Hands)

39.     PMC comes to this Court with unclean hands and is precluded at law and in equity from asserting any of the claims purported to be set forth in the Complaint.  Accordingly, Zynga is entitled to its attorneys' fees and costs.

## ELEVENTH AFFIRMATIVE DEFENSE

### (Unenforceability)

40.     The relief sought by PMC is barred in whole or in part by the unenforceability of each of the Patents in Suit.

## TWELFTH AFFIRMATIVE DEFENSE

### (Failure to Pay Fees)

41.     One or more of the Patents in Suit are invalid, abandoned, or otherwise unenforceable for failure to pay fees as required by 35 U.S.C. § 41, or as required by other applicable statutes, regulations, rules, or procedures.

## THIRTEENTH AFFIRMATIVE DEFENSE

### (Patent Misuse)

42.     Zynga refers to and incorporates by reference the allegations of paragraphs 8 through 38 of its Affirmative Defenses, above.

43.     Some or all of the Patents in Suit are unenforceable because PMC has engaged in patent misuse in connection with the prosecution and enforcement or attempted enforcement of the Patents in Suit.  As described above, PMC's inequitable conduct before the PTO in prosecuting the applications leading to issuance of the Patents in Suit and related Harvey Patents resulted in an intended, unlawful, and anticompetitive extension of PMC's improperly-obtained patent monopoly.  This inequitable conduct included failure to conduct its prosecution of the Harvey Patents with candor, in good faith, and without deceptive intent; intentional multiplication and complication of applications for patents presented to the PTO; obscuring facts relevant to the patentability of the applications through submission of great quantities of irrelevant information; improperly reducing the examination and other fees it was required to pay to the PTO through assertion of unfounded claims of small-entity status; and unreasonable and inexcusable delays in seeking and obtaining the claims of the Patents in Suit, as well as related patents issued to it in 2010 to date.  These activities were parts of PMC's plan to deliberately frustrate the PTO's ability to properly determine whether the applications merited issuance of

44.     Some or all of the Patents in Suit are unenforceable because PMC has engaged in patent misuse in connection with the licensing or attempted licensing of these patents.  PMC's licensing and attempted licensing of the Patents in Suit and other Harvey Patents comprise an unlawful attempt to extend PMC's ill-gotten patent monopoly, as described above, resulting in anticompetitive effects.  Under the doctrine of patent misuse, PMC's anticompetitive conduct renders the Patents in Suit unenforceable.

## FOURTEENTH AFFIRMATIVE DEFENSE

### (License)

45.     On information and belief, each of PMC's purported claims against Zynga is barred by licenses granted by PMC authorizing third parties to sell products or otherwise participate in the allegedly infringing activity, so that Zynga is impliedly licensed to engage in that activity.

## FIFTEENTH AFFIRMATIVE DEFENSE

### (Patent Exhaustion)

46.     On information and belief, each of PMC's purported claims against Zynga is barred by the doctrine of patent exhaustion.

## SIXTEENTH AFFIRMATIVE DEFENSE

### (Lack of Standing)

47.     Upon information and belief, PMC lacks standing to sue for infringement of relevant rights in the Patents in Suit.

### SEVENTEENTH AFFIRMATIVE DEFENSE

### (Reservation of Defenses)

48.     Zynga reserves all affirmative defenses under Rule 8(c) of the Federal Rules of

Civil Procedure and any other defenses, at law or in equity, that may be available now or may

become available in the future based on discovery or any other factual investigation in this case.

### COUNTERCLAIMS

Pursuant to Rule 13 of the Federal Rules of Civil Procedure, Zynga Inc. ("Zynga")

complains and alleges against Counterclaim-Defendant, Personalized Media Communications,

LLC ("PMC"), as follows:

### THE PARTIES

1.     Zynga is a corporation organized and existing under the laws of the State of

Delaware with a principal place of business at 699 Eighth Street, San Francisco, CA 94103.

2.     Upon information and belief, Counterclaim-Defendant PMC is a limited liability

company organized and existing under the laws of the State of Texas, with its principal place of

business at 14090 Southwest Freeway, Suite 450, Sugar Land, Texas 77478.

### JURISDICTION AND VENUE

3.     The following counterclaims arise under the Federal Declaratory Judgment Act,

28 U.S.C. §§ 2201 and 2202, and the United States Patent Laws, 35 U.S.C. §§ 101 *et seq.*  This

Court has subject matter jurisdiction over these counterclaims pursuant to 28 U.S.C. §§ 1331,

1338(a), 2201, 2202, and 35 U.S.C. § 1 *et seq.*

4.     PMC has submitted to the personal jurisdiction of this Court by bringing the

present action.

5.     This judicial district is one of several where venue lies over Zynga's claims for

declaratory relief because PMC is subject to personal jurisdiction in this Court, having, for example, instituted litigation in this Court. Therefore, venue for these counterclaims is proper in this district pursuant to 28 U.S.C. § 1391(c). However, Zynga reserves its rights to move the Court to transfer this action to another, more convenient venue pursuant to 28 U.S.C. § 1404.

## THE PATENTS IN SUIT

6.      On information and belief, PMC alleges that it is the owner of all rights, title, and interest in and under United States Patent No. 7,797,717 ("the '717 Patent").

7.      On information and belief, PMC alleges that it is the owner of all rights, title, and interest in and under United States Patent No. 7,908,638 ("the '638 Patent").

8.      On information and belief, PMC alleges that it is the owner of all rights, title, and interest in and under United States Patent No. 7,734,251 ("the '251 Patent").

9.      On information and belief, PMC alleges that it is the owner of all rights, title, and interest in and under United States Patent No. 7,860,131 ("the '131 Patent").

## EXISTENCE OF AN ACTUAL CONTROVERSY

10.      On February 10, 2012, PMC filed the Complaint against Zynga, which alleges infringement by Zynga of the '717 Patent, the '638 Patent, the '251 Patent, and the '131 Patent (collectively, the "Patents in Suit"). In its Answer and Affirmative Defenses, Zynga denies these allegations; specifically, Zynga contends that it does not infringe the Patents in Suit and that the Patents in Suit are invalid and unenforceable. Based on PMC's Complaint and Zynga's Answer and Affirmative Defenses thereto, there exists an actual, justiciable controversy between PMC and Zynga concerning the Patents in Suit.

## FIRST COUNTERCLAIM

### (Declaratory Judgment of Non-Infringement of the '717 Patent)

11.     Zynga refers to and incorporates by reference its allegations in paragraphs 1-10 of its Counterclaims as if fully set forth herein.

12.     Zynga seeks a declaratory judgment that it does not infringe, and has not infringed, any valid claim of the '717 Patent.

13.     An actual, justiciable controversy exists between Zynga and PMC with regard to the alleged infringement of the '717 Patent.

14.     Zynga does not infringe, and has not infringed, directly, indirectly, contributorily, and/or by inducement, any valid claim of the '717 Patent, and no product manufactured, used, sold, or offered for sale by Zynga infringes, or has infringed, any valid claim of the '717 Patent, either directly or indirectly, literally or under the doctrine of equivalents.

## SECOND COUNTERCLAIM

### (Declaratory Judgment of Non-Infringement of the '638 Patent)

15.     Zynga refers to and incorporates by reference its allegations in paragraphs 1-14 of its Counterclaims as if fully set forth herein.

16.     Zynga seeks a declaratory judgment that it does not infringe, and has not infringed, any valid claim of the '638 Patent.

17.     An actual, justiciable controversy exists between Zynga and PMC with regard to the alleged infringement of the '638 Patent.

18.     Zynga does not infringe, and has not infringed, directly, indirectly, contributorily, and/or by inducement, any valid claim of the '638 Patent, and no product manufactured, used, sold, or offered for sale by Zynga infringes, or has infringed, any valid claim of the '638 Patent,

either directly or indirectly, literally or under the doctrine of equivalents.

## THIRD COUNTERCLAIM

### (Declaratory Judgment of Non-Infringement of the '251 Patent)

19.     Zynga refers to and incorporates by reference its allegations in paragraphs 1-18 of its Counterclaims as if fully set forth herein.

20.     Zynga seeks a declaratory judgment that it does not infringe, and has not infringed, any valid claim of the '251 Patent.

21.     An actual, justiciable controversy exists between Zynga and PMC with regard to the alleged infringement of the '251 Patent.

22.     Zynga does not infringe, and has not infringed, directly, indirectly, contributorily, and/or by inducement, any valid claim of the '251 Patent, and no product manufactured, used, sold, or offered for sale by Zynga infringes, or has infringed, any valid claim of the '638 Patent, either directly or indirectly, literally or under the doctrine of equivalents.

## FOURTH COUNTERCLAIM

### (Declaratory Judgment of Non-Infringement of the '131 Patent)

23.     Zynga refers to and incorporates by reference its allegations in paragraphs 1-22 of its Counterclaims as if fully set forth herein.

24.     Zynga seeks a declaratory judgment that it does not infringe, and has not infringed, any valid claim of the '131 Patent.

25.     An actual, justiciable controversy exists between Zynga and PMC with regard to the alleged infringement of the '131 Patent.

26.     Zynga does not infringe, and has not infringed, directly, indirectly, contributorily, and/or by inducement, any valid claim of the '131 Patent, and no product manufactured, used,

sold, or offered for sale by Zynga infringes, or has infringed, any valid claim of the '131 Patent, either directly or indirectly, literally or under the doctrine of equivalents.

## FIFTH COUNTERCLAIM

### (Declaratory Judgment of Invalidity of the '717 Patent)

27.     Zynga refers to and incorporates by reference its allegations in paragraphs 1-26 of its Counterclaims as if fully set forth herein.

28.     Zynga seeks a declaratory judgment that the '717 Patent is invalid.

29.     An actual, justiciable controversy exists between Zynga and PMC with regard to the validity of the '717 Patent.

30.     The '717 Patent is invalid and unenforceable for double-patenting and/or failure to meet one or more of the statutory requirements for patentability established by the United States Patent Laws, 35 U.S.C. § 101, *et seq.*, including one or more provisions of §§ 101, 102, 103 and/or 112.

## SIXTH COUNTERCLAIM

### (Declaratory Judgment of Invalidity of the '638 Patent)

31.     Zynga refers to and incorporates by reference its allegations in paragraphs 1-30 of its Counterclaims as if fully set forth herein.

32.     Zynga seeks a declaratory judgment that the '638 Patent is invalid.

33.     An actual, justiciable controversy exists between Zynga and PMC with regard to the validity of the '638 Patent.

34.     The '638 Patent is invalid and unenforceable for double-patenting and/or failure to meet one or more of the statutory requirements for patentability established by the United States Patent Laws, 35 U.S.C. § 101, *et seq.*, including one or more provisions of §§ 101, 102,

103 and/or 112.

## SEVENTH COUNTERCLAIM

### (Declaratory Judgment of Invalidity of the '251 Patent)

35.     Zynga refers to and incorporates by reference its allegations in paragraphs 1-34 of its Counterclaims as if fully set forth herein.

36.     Zynga seeks a declaratory judgment that the '251 Patent is invalid.

37.     An actual, justiciable controversy exists between Zynga and PMC with regard to the validity of the '251 Patent.

38.     The '251 Patent is invalid and unenforceable for double-patenting and/or failure to meet one or more of the statutory requirements for patentability established by the United States Patent Laws, 35 U.S.C. § 101, *et seq.*, including one or more provisions of §§ 101, 102, 103 and/or 112.

## EIGHTH COUNTERCLAIM

### (Declaratory Judgment of Invalidity of the '131 Patent)

39.     Zynga refers to and incorporates by reference its allegations in paragraphs 1-38 of its Counterclaims as if fully set forth herein.

40.     Zynga seeks a declaratory judgment that the '131 Patent is invalid.

41.     An actual, justiciable controversy exists between Zynga and PMC with regard to the validity of the '131 Patent.

42.     The '131 Patent is invalid and unenforceable for double-patenting and/or failure to meet one or more of the statutory requirements for patentability established by the United States Patent Laws, 35 U.S.C. § 101, *et seq.*, including one or more provisions of §§ 101, 102, 103 and/or 112.

## NINTH COUNTERCLAIM

### (Patent Misuse)

43.     Zynga refers to and incorporates by reference its allegations in paragraphs 1-42 of its Counterclaims as if fully set forth herein.

49.     PMC has engaged in anticompetitive conduct in connection with the prosecution and enforcement or attempted enforcement of the Patents in Suit.  Specifically, as described below, PMC's inequitable conduct before the PTO in prosecuting the applications leading to the issuance of the Patents in Suit and related patents belonging to the same patent family (collectively, the "Harvey Patents") resulted in an intended, unlawful, and anticompetitive extension of PMC's improperly-obtained patent monopoly.  This inequitable conduct included failure to conduct its prosecution of the Harvey Patents with candor, in good faith, and without deceptive intent; intentional multiplication and complication of applications for patents presented to the PTO; obscuring facts relevant to the patentability of the applications through submission of great quantities of irrelevant information; improperly reducing the examination and other fees it was required to pay to the PTO through assertion of unfounded claims of small-entity status; and unreasonable and inexcusable delays in seeking and obtaining the claims of the Patents in Suit, as well as related patents issued to it in 2010 to date.  These activities were parts of PMC's plan to deliberately frustrate the PTO's ability to properly determine whether the applications merited issuance of patents and to delay the PTO's ultimate issuance of the patents so as to unjustifiably prolong PMC's term of patent exclusivity.  Under the doctrine of patent misuse, PMC's anticompetitive conduct renders the Patents in Suit unenforceable.

50.     As with any applicant before the PTO, PMC, its predecessors-in-interest, its agents, and the inventors owed the PTO a duty of candor and good faith, including a duty of

disclosure.  As described herein, one or more of these agents violated their duties by misrepresenting material information to and withholding material information from the PTO. The actions of the applicants were sufficiently egregious to cause the examiner to issue a communication that specifically stated his belief that the actions of the applicants were intended to deceive the PTO and that those actions harmed the public interest.  Upon information and belief, PMC's misrepresentations and failure of disclosure were done with intent to deceive and/or mislead the PTO.  In the absence of such failure, the Harvey Patents would not have issued with their claims in the form they were issued, would have been cancelled or confirmed only with amendments in reexamination, or would have been issued only with terminal disclaimers.  However, with the Harvey Patents having issued, PMC has achieved its desired anticompetitive effect of unlawfully extending its patent monopoly, thereby rendering the Patents in Suit unenforceable under the doctrine of patent misuse.

51.    The Patents in Suit share a common ancestry with each other and with dozens of other applications in the portfolio of alleged inventor John Christopher Harvey ("Harvey Portfolio").  The earliest parent application, Serial No. 06/317,510, was filed on November 3, 1981 ("the 1981 application") and was ultimately issued on September 15, 1987.  The 1981 application contained 44 pages of text.

52.    On February 14, 1986, a continuation application (Serial No. 06/829,531) was filed from the 1981 application.  From that continuation application, a continuation-in-part application (Serial No. 07/096,096) was filed on September 11, 1987 ("the 1987 application"). The 1987 application contained 557 pages of text.  Between March 2, 1995 and June 7, 1995, in an apparent effort to beat the GATT amendments in 1995 that were set to change the patent term from 17 years from patent issuance to 20 years from the filing of the first application, PMC filed

53.     While the 1987 application claimed priority back to the 1981 application, the
1987 application did *not* incorporate by reference any part of the 1981 application and the 1987
and 1981 applications described significantly different subject matter.  On information and belief,
PMC failed to disclose and misrepresented the dissimilarities between the 1981 and 1987
applications during prosecution of the Patents in Suit and related patents so as to induce the PTO
into treating claims based upon the disclosures of the 1987 application as supported by the
disclosures of the 1981 application, thereby obtaining issuance of claims that were not novel at
the time of the 1987 application.  As will be referenced in more detail below, the primary
examiner of the Harvey Portfolio stated that a pattern of intentional misrepresentations of the
legal application of 35 U.S.C. §§ 120 and 112 permeated the Harvey Portfolio.

54.     On information and belief, PMC withheld relevant and material information from
the PTO despite PMC's duty to disclose.  One such instance was with respect to five oppositions
that were filed in late 1997 to early 1998 against PMC's European application (App. No.
88908836.5) in the European Patent Office.  The oppositions included prior art and arguments
relevant and material to PMC's U.S. applications.  On January 8, 1999, PMC filed a response to
these oppositions.  On the issue of priority, which was an issue relevant and material to many of
PMC's U.S. applications, PMC argued that "every single claim of the opposed patent includes at
least one essential element of the additional subject matter" found in the 1987 application but *not*
the 1981 application.  Even though the claims of PMC's European application may not be
identical to the claims of PMC's U.S. applications, PMC's admission regarding the European
claims would be highly relevant in determining the difference in scope between the 1981 and the

1987 applications.  However, despite the high relevancy and materiality of the oppositions and

response, PMC merely provided the USPTO with the application number of the European

application without identifying the oppositions and response.  On information and belief, these

omissions were made with intent to conceal the oppositions and response in order to deceive the

PTO as to the patentability and priority of the claims that issued in the Patents in Suit and in

related patents.

      55.     Another tactic PMC used to conceal relevant and material information was to

overwhelm the PTO with information.  PMC submitted to the PTO huge sets of references, most

of which were of no or limited pertinence to the claims being examined or reexamined, within

which highly relevant references were buried, rendering "disclosure" of those highly relevant

references purposely ineffective.  For example, during prosecution of the '717 Patent, over 2700

references were submitted to the examiner.  Some of these references were unquestionably

irrelevant.  For example, the faces of the Patents in Suit cite U.S. Patent No. 33,189 (Dougal), a

1861 patent that is titled "Improvement in Bee-Hives"; U.S. Patent No. 2,731,197 (Parker *et al*.),

a 1956 patent that is directed to an improved "stop pin box" used to control "calculator actuators"

in accounting machines; and U.S. Patent No. 4,473,068 (Oh), a 1982 patent that is directed to an

improved implant "for use in retention of the greater trochanter" in hip replacements.  Within

this massive disclosure were several key references, including: U.S. Patent Nos. 3,886,302

(Kosco); 4115,662 (Gulnet *et al*.); 4,186,413 (Mortimer); 4,295,223 (Shutterly); 4,305,101

(Yarbrough *et al*.); 4,323,922 (den Toonder *et al*.); 4,390,901 (Keiser); and 4,488,179 (Kruger *et

al*.).  On information and belief, PMC deliberately buried highly relevant references in an effort

to thwart proper examination of the claims and did so intending to deceive the PTO.

      56.     The amount of information disclosure presented to the examiner was exacerbated

by the fact that the application of the 1987 application, which gave rise to the Patents in Suit, was 557 pages. On information and belief, this massive specification was submitted to overwhelm the examiner and preclude effective review of the application by the PTO. As an example, due to the unnecessary length of the 1987 application, it is exceedingly difficult to accurately assess issues such as written description and enablement. Additionally, the length of the specification makes it very difficult to determine what subject matter is common to the 1981 and 1987 applications.

57.     Moreover, the applicants submitted unnecessarily numerous claims during prosecution of the Harvey applications. For example, during prosecution of the claims that ultimately issued as the '251 Patent, PMC presented the PTO with 197 claims. On information and belief, the numerous claims were submitted to overwhelm the examiner and to preclude effective review of the applications by the PTO. In addition, in all of the Harvey applications, PMC sought thousands of patent claims, making it impractical for the PTO to assess whether any claims in different patents were directed to the same patentable invention. On information and belief, these actions were undertaken with intent to deceive the PTO into allowing or confirming claims that were not actually patentable.

58.     PMC's pattern of dishonesty also was evident in its claim of small entity status in violation of the relevant rules and regulations regarding payment of fees as a small or large entity. Such misrepresentation constituted fraud on the PTO. The Manual of Patent Examining Procedure states that "small entity status must not be established unless the person or persons signing the verified statement can unequivocally make the required self-certification." M.P.E.P. § 509.03 (6th ed., Jan. 1995). "[A]ny attempt to improperly establish status as a small entity will be viewed as a serious matter by the [PTO]." *Id.* The PTO does not normally question claims to

entitlement to small entity status, but improper claiming of such status may be considered fraud

on the PTO.  *See* 37 C.F.R. §1.28(d)(2) (1995) ("Improperly and with intent to deceive (i)

Establishing status as a small entity, or (ii) Paying fees as a small entity shall be considered as a

fraud practiced or attempted on the Office.").

  59.  It is clear that the applicants had actual knowledge that claiming small entity

status for the Harvey patent applications was inappropriate by December 1994, at the latest.  In

January 1995, after allowance of one of the parents of the Patents in Suit (U.S. Patent No.

5,335,277), a document titled "Notification of Change in Status Under 27 C.F.R. § 1.28(b) and

Payment of Issue Fee Deficiency Under 37 C.F.R. § 1.28(c)" was submitted by PMC's

predecessor-in-interest, Personalized Mass Media Corporation ("PMMC").  That submission

stated (emphasis added):

> Pursuant to 37 C.F.R. § 1.28(c), Attorneys for Applicants hereby
> provide notification that Personalized Mass Media Corporation
> ("PMMC"), the assignee of U.S. Patent No. 5,335,277, no longer
> qualifies for small entity status under M.P.E.P. § 509.02 and 37
> C.F.R. § 1.9 for paying reduced patent fees for U.S. Patent No.
> 5,335,277.  *PMMC lost its entitlement to small entity status for U.S.
> Patent No. 5,335,277 in March, 1994 as a result of a license
> agreement with a large entity.*  Applicants and Attorneys for
> Applicants were unaware that PMMC lost its entitlement to small
> entity status in March, 1994 and inadvertently paid the reduced
> issue fee for U.S. Patent No. 5,355,277 on May 12, 1994 claiming
> small entity status.

A verified statement from the applicants' counsel, Thomas Scott, Jr., was submitted in support of this document.  It purported to explain "how the error in good faith occurred."  In the verified statement, Mr. Scott stated that PMMC was *not* actually entitled to small entity status as of March 1994 and that he did not realize that fact until December 1994.

60.     On information and belief, PMC also had licenses with other large entities by January 1996.  Any such agreements would have been relevant to the claiming of small entity status for the Harvey Patents and patent applications as of the dates of the agreements.  On information and belief, PMMC and Sony entered into a license agreement on October 31, 1995, and PMMC and The Weather Channel entered into a license agreement on January 31, 1996.

61.     Despite having actual knowledge that it was not entitled to claim small entity status, over a period of several years PMC continued to make such claims during prosecution of the Patents in Suit.  It was not until 2000 that PMC belatedly admitted that its status as a small entity "has been changed" and that small entity fees were inappropriate.  PMC filed a "Notification of Change of Status Under 37 C.F.R. § 1.28(B) and Payment of Fee Deficiencies Under 37 C.F.R. § 1.28(C)," which was accepted by the PTO.  However, in these submissions, PMC did *not* indicate to the PTO that the supposed error had been discovered approximately six years earlier, in late 1994, or that it had previously filed a verified statement regarding the supposed errors.  PMC also did not provide an explanation for the repeated small entity status errors or explain why it did not correct the errors years earlier.

62.     On information and belief, PMC concealed the truth regarding the improper claims to small entity status to mislead the PTO into concluding that the errors were made in good faith and therefore could be excused under 37 C.F.R. § 1.28(c) (1995).  On information and belief, PMC's claims of small entity status from 1994 to 2000 were not made with the belief they

were justified, nor were the small entity fees paid in that period paid in good faith. This pattern of improperly claiming small entity status constituted fraud on the PTO.

63.    PMC's pattern of improper actions during prosecution of these applications caused the examiner to issue a remarkable communication. In the 38-page document, the examiner stated that the applicants had engaged in a systematic strategy to mislead and overwhelm the PTO and did so intending to deceive the PTO. The communication was filed in several Harvey applications, including Serial No. 08/113,329 on January 26, 2001. A copy of the document is attached as Exhibit A.

64.    In the communication, the examiner stated: "Applicants and their counsel (Thomas Scott, Jr.) have been attempting to secure patents by pursuing their unique, but improper, prosecution strategy for many years . . . . Applicants' prosecution 'strategy' has involved the submission of tens of thousands of claims, as well as thousands [of] prior art references, a substantial number of which are irrelevant." Exhibit A at 3 (internal quotation omitted). The Examiner stated that the files of the various Harvey Patents "are replete with a pattern of material misrepresentations of law and related factual omission. As a consequence, the portfolio prosecution record adds up to a virtually meaningless record as to the merits and thus, among other things, has caused unjustifiable and prejudicial delay." *Id.* at 7. The examiner stated his belief that these actions were not unintentional: "For the purpose of protecting the public interest, the primary examiner states for the record that he firmly believes it was the principal counsel's intent to mislead the U.S.P.T.O." *Id.* at 15.

65.    As to the priority issue, the examiner stated that applicants knew or should have known that "continuity of disclosure" was required for a claim to be entitled to the filing date of an earlier application. *Id.* at 11. The examiner noted that the Administrative Law Judge in an

ITC investigation involving some of the earlier Harvey Patents "reproached applicants for improperly identifying written description from the 1981 44-page parent specification" and that they received judicial notice that "the written description for applicants' claims is necessarily found in the 1987 557-page specification and not the 1981 44-page specification." *Id.* at 12.  The examiner stated that the applicants' arguments regarding priority "do not appear to be *bona-fide*" and that the applicants' submissions "misstate the legal test" for priority.  *Id.* at 13.  Moreover, "the primary examiner and other U.S.P.T.O. examiners have relied in good faith" on applicants' misstatements and omissions.  *Id.* at 14.  The examiner stated that applicants engaged in "a blatant attempt to obtain literal patent coverage claiming priority to 1981 for something that they did not have in their possession as of the 1981 filing date."  *Id.* at 30.  These acts, and others, "caused unjustifiable and prejudicial delay" and are "grounds for rejections of the claim on the basis of laches."  *Id.* at 14.

66.     As to the extraordinary number of claims presented during prosecution, the examiner noted that a "conservative" estimate is that the applicants presented "between 18 and 36 claims per page of the 1987 description; i.e., about one claim for every 8.5 to 17.7 words."  *Id.* at 19.  The examiner concluded:  "The number of claims filed by applicants has caused unjustifiable and prejudicial delay."  *Id.*

67.     As to the extraordinary number of references cited by applicants during prosecution, the examiner noted that during prosecution of the application then under consideration, "applicants have filed approximately 2,200 references, many of which are irrelevant."  *Id.* at 20.  The examiner stated that some foreign references were not accompanied by statements of relevance or translations and were therefore in violation of PTO rules.  Among the irrelevant references were patents to a beehive and business cards.  *See id.*  The examiner

concluded:  "These, among other references, create an onerous burden on the U.S.P.T.O. and have caused unjustifiable and prejudicial delay."  *Id.*

68.     As to the small entity issue, the examiner noted that the applicants simultaneously had claimed small and large entity status for similar subject matter.  *Id.* at 31-36.  The examiner noted that the PTO had requested an explanation for the varying payments, but had not received one.  *Id.* at 31.  The examiner stated that there did not appear to be a difference in the subject matter of the varying claims to small or large entity status and that entity status was inconsistently claimed even within the applicants' subject matter groupings.  The examiner noted that the applicants' counsel had discussed the small/large entity issue with the PTO "at least as early as August 13, 1995."  *Id.* at 34.  The examiner observed that applicants changed the claimed entity status even within the same application.  *See id.*

69.     The examiner noted that the applicants seemed to have tried to justify the inconsistent claims of small and large entity status on a "field of use" clause in a license agreement.  The examiner stated:

> However, over the duration of many months, applicants' "strategy" has
> included a pattern of changing one or another of the portfolio's 329
> applications to and from small and large entity.  Further, the portfolio fee
> payment record reflects applicants' counsels signing both small and large
> fee transmittal letters for the portfolio, on the same day.  The fact that the
> same counsel would sign apparently contradictory fee transmittal letters
> for both of applicants' portfolios' large and small inventions, claiming the
> same subject matter, does not appear to be inadvertent.

*Id.* at 35.  The examiner also noted that applicants paid a number of deficient fees only in 2000,

despite the fact that the applicants' counsel was made aware of the issue in a personal interview with a PTO examiner years earlier.  *Id.* at 36.

70.     The examiner also noted other issues, including the applicants' untimely preliminary submissions (*id.* at 20), the applicants' filing of substantially duplicate claims in different applications (*id.* at 20-21), failure to alert examiners handling different Harvey applications of prior art rejections of the same or similar claims in other applications (*id.* at 21), attempting to obtain different interpretations of prior art references from different examiners (*id.* at 24), failing to alert examiners of conflicts between applications directed to the same subject matter but assigned to different examiners (*id.* at 24-25), and the applicants' failure to comply with an agreement with the PTO to consolidate the many Harvey applications into fewer applications (*id.* at 31).

71.     PMC filed a response to the communication.  The PTO later determined that the statements in the communication were not related to patentability of the subject matter claimed in the then-pending applications and, therefore, the communication was withdrawn in some or all of the then-pending Harvey cases on procedural grounds.  In withdrawing the communication, however, the PTO did not do so on the basis that any of the facts contained in the communication were inaccurate.

72.     As a result of the 557-page 1987 application, thousands of cited references, thousands of claims, and hundreds of applications, the examiners likely were forced to rely to a greater extent than usual on the disclosures and representations of PMC.  And, as described above, those disclosures and representations were incomplete and misleading.

73.     These actions relating to the Harvey Patents and patent applications have occurred over a period of many years and evidence a systematic and improper strategy of prosecution.  On

74.     PMC could have filed the applications that resulted in the Patents in Suit eight to fourteen years earlier than their actual filing dates.  Instead, PMC chose to wait nearly fourteen years—until 1995—to file the applications that resulted in the Patents in Suit and even waited years after that—as late as 2003 in some cases—before presenting for the PTO's examination the claims that ultimately issued.  The claims in the Patents in Suit purportedly are based on the disclosure common to both the 1981 and 1987 applications or the disclosure unique to the 1987 application.  As a result, PMC had possession of all the disclosed concepts in either 1981 or 1987 and could have presented its patent claims for the PTO's examination at that time.  PMC delayed that presentation for well over a decade, biding its time while others invested in, developed, and introduced new products and services.  After allowing others to expend their innovative energies, PMC presented new claims that were ostensibly supported by the 1981 or 1987 applications but actually were carefully crafted with vague wording to target the others' innovations.

75.     It was not until the eve of the effective date of the patent-law amendments implementing the GATT TRIPS agreement (June 8, 1995), after which the term of any resulting patent in the Harvey Portfolio would have been anchored to PMC's claimed priority dates, that PMC finally filed its more than 300 applications, containing hundreds of new patent claims calculated to read on the then-latest technology.  Even then, PMC's continual revision of the claims it presented for the PTO's examination was not concluded; PMC first presented many of

the claims in the Patents in Suit for the PTO's examination by amendments years after that.

76.     PMC's efforts in extending its monopoly over the subject matter in its 1981 and 1987 disclosures went well beyond merely delaying the filing of new applications and presentation of new claims.  As indicated previously, PMC had grossly misused the patent process to stall prosecution to obtain later issuance dates.  For example, PMC had misrepresented the law and prior art to the PTO, swamped the examiners with more than 2700 references (including many that were clearly irrelevant), and overwhelmed the PTO with more than 300 applications, thousands of claims, and a 557-page specification.  Consequently, it became a daunting task for the PTO to even find written description support for the claims and identify double patenting issues, let alone examine the novelty of the claims.  It was not until 2010 and 2011—more than fifteen years since the 1995 filing dates—that the Patents in Suit were issued.

77.     By virtue of the calculated delays caused by PMC, PMC postponed examination of these patent claims for decades.  As a result, due to the passage of time and retirement of examiners familiar with what was already known before PMC's alleged 1981 and 1987 priority dates, the PTO's efforts to properly examine whether PMC's claims reflected new inventions were frustrated.  In addition, PMC's delay tactics have extended the limited 17-year monopoly afforded to what it ostensibly disclosed in 1981 and/or 1987 to 2027 and beyond.  While all of the Harvey Patents that were filed before 1995 have long since expired, the patent term has just begun for the four Patents in Suit and at least 52 other Harvey Patents.  By so manipulating the patent system, PMC has effectively obtained a monopoly of at least 42 years over claims based on its 1981 application (first patent issued in 1987) and at least 39 years over claims based on its 1987 application (first patent issued in 1990).  Over the course of its monopoly, PMC has subjected numerous industry-leading innovators to significant and unjustified harms.

78.     PMC unreasonably and inexcusably delayed seeking and obtaining the claims of the Patents in Suit, as well as related patents issued to it in 2010 to date, with consequent anti-competitive harm to Zynga and other members of the public.  Its inequitable conduct before the PTO, including its unreasonable and inexcusable delays in prosecuting the applications leading to issuance of the Patents in Suit, has resulted in an intended, unlawful, and anticompetitive extension of PMC's patent monopoly, rendering the Patents in Suit and the related patents unenforceable under the doctrine of patent misuse.

79.     Further, PMC has engaged in anticompetitive conduct in connection with the licensing or attempted licensing of the Patents in Suit.  PMC's licensing and attempted licensing of the Patents in Suit and other Harvey Patents comprise an unlawful attempt to extend PMC's ill-gotten patent monopoly, as described above, resulting in anticompetitive effects.  Under the doctrine of patent misuse, PMC's anticompetitive conduct renders the Patents in Suit unenforceable.

## EXCEPTIONAL CASE

80.     On information and belief, this is an exceptional case entitling Zynga to an award of its attorneys' fees incurred in connection with defending and prosecuting this action pursuant to 35 U.S.C. § 285, as a result of, *inter alia*, PMC's assertion of the Patents in Suit against Zynga with the knowledge that Zynga does not infringe any valid or enforceable claim of the Patents in Suit and/or that the Patents in Suit are invalid and/or unenforceable.

## PRAYER FOR RELIEF

WHEREFORE, Zynga respectfully prays for judgment against PMC as follows:

(a)     That Zynga does not infringe and has not infringed any claim of the Patents in Suit, directly or indirectly, literally or under the doctrine of equivalents;

(b)      That the Patents in Suit are invalid;

(c)      That the Patents in Suit are unenforceable;

(d)      That all relief requested by PMC should be denied;

(e)      That all of PMC's claims should be dismissed with prejudice;

(f)      That judgment should be entered against PMC and in favor of Zynga in all

respects;

(g)      That this is an exceptional case under 35 U.S.C. § 285 and awarding Zynga its

costs (including expert fees), expenses, and reasonable attorneys' fees incurred in this action; and

(h)      That Zynga be awarded such other and further relief as the Court may deem just

and proper.

### DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Zynga hereby demands a

trial by jury on all issues so triable.

Dated:  May 4, 2012                              Respectfully submitted,

                                                 */s/ Robert W. Kantner*
                                                 Robert W. Kantner
                                                 Texas State Bar No. 11093900
                                                 rwkantner@jonesday.com
                                                 Jones Day
                                                 2727 N. Harwood St.
                                                 Dallas, Texas 75201
                                                 Telephone:      (214) 220-3939
                                                 Facsimile:      (214) 969-5100

                                                 (CONTINUED ON NEXT PAGE)

Greg L. Lippetz
California State Bar No. 154228
glippetz@jonesday.com
Jacqueline K. S. Lee
California State Bar No. 247705
jkslee@jonesday.com
Jones Day
1755 Embarcadero Road
Palo Alto, CA  94303
Telephone:    (650) 739-3939
Facsimile:    (650) 739-3900

Louis L. Touton
Texas State Bar No. 20151150
lltouton@jonesday.com
Jones Day
555 South Flower Street, Fiftieth Floor
Los Angeles, CA 90071
Telephone:    (213) 489-3939
Facsimile:    (213) 243-2539

Melissa R. Smith
Texas State Bar No. 24001351
melissa@gillamsmithlaw.com
Gillam & Smith
303 S. Washington Avenue
Marshall, TX  75670
Telephone:    (903) 934-8450
Facsimile:    (903) 934-9257

ATTORNEYS FOR DEFENDANT
ZYNGA INC.

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a)(3) on May 4, 2012.

<i><u>/s/ Robert W. Kantner</u></i>